[Cite as *In re J.M.*, 2019-Ohio-801.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re J.M.

Court of Appeals Nos. L-18-1212
L-18-1213

Trial Court Nos. JC 18268737
JC 18268900

**DECISION AND JUDGMENT**

Decided: March 7, 2019

* * * * *

Laurel A. Kendall, for appellant.

Angela Y. Russell, for appellee.

* * * * *

**MAYLE, P.J.**

**Introduction**

{¶ 1} In these consolidated appeals, the Lucas County Court of Common Pleas, Juvenile Division, terminated the parental rights of mother and father and granted permanent custody of their baby boy, "J.M." to Lucas County Children Services

("LCCS"), the appellee herein. In its September 27, 2018 judgment entry, the trial court found that (1) mother's chemical dependency was so severe that it rendered her unable to provide an adequate permanent home for J.M.; (2) that father had abandoned J.M.; and (3) that both mother and father had previously had their parental rights involuntarily terminated with respect to four of J.M.'s siblings and failed to provide clear and convincing evidence that, despite the prior terminations, they could provide a legally secure permanent placement for J.M. The court concluded that it was in J.M.'s best interest to be placed in the permanent custody of LCCS. In a companion case, the court also denied a third-party complaint for legal custody of J.M. filed by a friend of mother's.

{¶ 2} On appeal, mother argues that the trial court's findings—that the child could not be returned to her within a reasonable time and that it was in the child's best interests to deny legal custody to the third-party complainant—were against the manifest weight of the evidence. As set forth below, we affirm the decision of the lower court to grant permanent custody of J.M. to LCCS. Because father did not appeal, the issues discussed herein are limited primarily to the evidence presented relative to the mother's parental rights.

**Background and Facts**

{¶ 3} On March 17, 2018, an anonymous referral was made to LCCS that the mother ("T.B.") and the alleged father ("Ja.M.") were shown on social media in a physical altercation in front of the Social Security building. The referral source reported that T.B. was holding a baby and that she "placed the child down on the ground before

2.

punching another female in the face." The source also reported that T.B. was abusing marijuana and "LEAN."[1]

{¶ 4} T.B.'s relationship with LCCS began in 2011. Between 2013 and 2016, she and Ja.M. lost permanent custody of their four children.[2] Therefore, when LCCS received a referral that T.B. and Ja.M. may have had a new baby, combined with reports of drug abuse and violence, LCCS investigated. LCCS caseworker, Amir Shabazz, made "numerous" visits to T.B.'s home but never made contact with her. On one of the visits, Shabazz left some paperwork from his office. Shortly thereafter, T.B. came to the agency where she admitted to the fight but was "adamant" that she had not had another baby. LCCS's request for interim temporary custody was denied by the juvenile court, in the absence of any proof that T.B. had a baby under her care.

{¶ 5} Two months later, in May of 2018, a second anonymous referral was made to LCCS. According to Shabazz, the referral source claimed that T.B. had delivered a baby boy in a "hotel room in Michigan"; that she was "hiding from" LCCS; and that she had not taken the baby to a doctor since his birth. The source also claimed to have

---

[1] LEAN, also known as "purple drank," is a carbonated drink containing codeine-promethazine, a controlled substance. *See* www.dea.gov.

[2] Evidence admitted during the proceedings established that LCCS was granted permanent custody of Ti'N.M. (d.o.b. 8/4/11) and T.M. (d.o.b. 12/5/12) on November 14, 2013 in case Nos. JC 11219231 and JC 12228945, respectively; T.B. (d.o.b. 4/30/14) on January 11, 2016 in case No. JC 14240086; and Ja'M.B. (d.o.b. 6/12/16) on November 23, 2016 in case No. JC16256280.

3.

witnessed "mom smacking the baby in the kitchen" and "some domestic violence in the home" between T.B. and Ja.M. Based upon that report, Shabazz returned to T.B.'s home on May 8, 2018. Shabazz was assisted by LCCS assessment worker Brian Murphy, Toledo Police Officer James Marquis, and Marquis' partner. At that time, LCCS still did not have confirmation that T.B. had a baby of her own or under her care.

{¶ 6} T.B. was living in a second story apartment of a duplex, located in Tudor Street in Toledo. When the caseworkers and officers arrived, they noticed a stroller near the house and a very small diaper in a trashcan. T.B. was outside and denied that there were any children living with her. When the officers and caseworkers heard a baby crying from within the apartment, T.B. allowed them to come inside. There, they found J.M., approximately four months old, sitting in an infant recliner chair. T.B. denied that the baby was hers.

{¶ 7} By all accounts, a strong odor of marijuana permeated the home. Murphy described the scent as so "extreme" that it made him "dizzy and cause[d] a headache" which, he testified, was "unusual" because, in his line of work, he is subjected to the smell of marijuana "on frequent occasions." The evidence also established that the apartment was clean, appropriately furnished, and outfitted with diapers, formula and other baby items.

{¶ 8} Because T.B. had a baby in the home, combined with the strong odor of marijuana, the caseworkers were instructed by their supervisor to take possession of J.M. When T.B. learned that the baby would be taken, she became "extremely emotional" and

4.

"lunged" for J.M.  Officer Marquis testified that T.B.'s movements created a safety hazard for the baby and that she had to be pulled off of the baby and restrained.  T.B. said repeatedly, "I am not trying to hurt this baby."  When T.B. made threats to harm herself, officers suggested that she voluntarily commit herself to Rescue Crisis, which she agreed to do, and they escorted her there.

{¶ 9} Shabazz testified that because no evidence of physical abuse toward J.M. was evident, the referral was deemed "unsubstantiated."  Nonetheless, Shabazz determined that J.M. was at "intense" risk (the most severe type) due to the obvious drug use within the home and reports from witnesses "in the neighborhood" of domestic violence between T.B. and Ja.M.

{¶ 10} The next day, May 9, 2018, Murphy met with T.B. at LCCS for a case planning meeting.  T.B. disclosed to him that she delivered J.M. on December 13, 2017, in a hotel in Bedford, Michigan.  The baby's father, Ja.M., was also there.  In January, the three of them returned to Toledo and stayed at the Family House, a shelter, which arranged housing for them at the apartment on Tudor Street.  T.B. told Murphy that she delivered her baby in a hotel room and did not seek medical care for him, before or after his birth, because she feared that LCCS would learn of the baby and take him from her.  T.B. admitted that she was still in a relationship with Ja.M. and that the two had a "few disagreements" since J.M.'s birth.  T.B. also admitted that she and Ja.M. "both smoked marijuana * * * frequently"; that she did so to relieve pain; and that she "did not feel that

[smoking marijuana] posed a risk to the child because she did not smoke around him." T.B. denied using LEAN.

{¶ 11} Evidence in the record established that T.B. was diagnosed in the past with cannabis disorder, bipolar disorder and oppositional defiance disorder. Murphy testified that T.B. had engaged in "some" services in the past, most recently from Unison, where she participated in parenting classes and treatment for substance abuse and mental health. However, Murphy also testified that "after [T.B.] lost custody of her very last child, she [would not allow LCCS] to have any information from the provider to get reports. She would not sign releases so [LCCS] did not know what her progress was." According to Murphy, T.B. also refused to participate in drug screening. And, while she did participate in some domestic violence services, T.B. "continued to maintain a relationship with [Ja.M.]" which displayed a "lack of judgment * * * [that] plac[ed] her child at risk." Murphy testified that T.B. had a history of violence, both as victim and perpetrator. He cited T.B.'s assault of the woman outside the Social Security office and a protection order that was taken out against her by the foster parents of one of J.M.'s siblings. The protection order remains in effect against T.B. until 2020.

{¶ 12} On May 10, 2018, LCCS filed a complaint alleging that J.M. was dependent and neglected. It requested permanent custody of J.M. on the basis of T.B.'s loss of permanent custody in four previous cases and because the issues that had caused the loss of custody (domestic violence, substance abuse, and mental health) had not been

remedied. (Case No. JC 18268737). Attorney Michael Bryant was appointed to serve as J.M.'s guardian ad litem (hereinafter "the GAL").

{¶ 13} On May 18, 2018, Ashley Evans-Jones (a.k.a. Ashley Nicole Evans) filed a third-party complaint for legal custody of J.M. (Case No. JC 18268900).

{¶ 14} On June 18, 2018, J.M. was placed with the foster parents of one of J.M.'s siblings. According to the GAL, J.M. would have gone there immediately but the foster parents "had serious concerns" that T.B. would "again stalk them," and they needed "a lot of time thinking about it before they said yes."

{¶ 15} An adjudicatory hearing was held on July 27, 2018. The purpose of an adjudicatory hearing is "to determine whether a child is * * * abused, neglected, or dependent or is otherwise within the jurisdiction of the court." Juv.R. 2(B). Based upon the evidence described above, the court found by clear and convincing evidence that J.M. was dependent and neglected. The case then proceeded to the dispositional phase, which "determine[s] what action shall be taken concerning [the] child." Juv.R. 2(M).

{¶ 16} Although paternity for J.M. was not established, the only potential father identified in the record was Ja.M., including T.B.'s testimony to that effect. The ongoing caseworker, Anna Moubarak, testified that she spoke with Ja.M. three or four times after the case was opened in May of 2018. During one call, Ja.M. agreed to meet Moubarak, but he did not show up, and in a follow up phone call, he hung up on her. He did not attend the hearings nor did he have any contact with J.M. (after the child was removed on

7.

May 8, 2018). Evidence in the record established that Ja.M. did not complete case services in any of the previous termination cases.

{¶ 17} The disposition hearing resumed on August 28, 2018. Moubarak testified that she met regularly with T.B. in May and June of 2018. According to Moubarak, T.B. told her that she was not currently receiving mental health services and admitted to marijuana usage "a couple of times a week." In mid-June, T.B. was indicted on two counts of aggravated arson. After her arrest, T.B. and Moubarak began meeting in the county jail. T.B. admitted that, after a night of drinking alcohol, she went to the home of a man to confront him about his accusation that she was a thief. When the man did not answer the door, T.B. poured cooking oil on a couch (on the front porch) and lit the couch on fire. Moubarak testified that she did not believe that T.B. had remedied the issues (domestic violence, mental health, and substance abuse) from her previous cases, and she elaborated that her "biggest concern" with regard to T.B.'s parenting was her refusal to rid herself of Ja.M., despite repeated promises in past cases that she would do so.

{¶ 18} T.B. also testified. She asked the court for a "second chance" and expressed a "strong connection with her baby." She said that her recent incarceration had helped her to understand that maintaining a relationship with her "abuser," i.e. Ja.M., was not in her or J.M.'s best interest. With regard to the arson charge, T.B. explained that she had recently entered an *Alford* plea, and was found guilty of aggravated arson, in violation of R.C. 2909.02(A)(2) and (B)(1) and (3), a felony of the second degree.

8.

(Lucas C.P. No. CR0201802082). She told the court that she expected to be sentenced the next day, August 29, 2018, and that she could receive community control in lieu of prison or, alternatively, that she could be sentenced between two and eight years in prison.

{¶ 19} In the event that she was sentenced to prison, T.B. asked the court to place J.M. into the care of her friend, Ashley Evans Jones, who, as discussed, filed a complaint for legal custody. Although Jones failed to complete the application process, such as arranging for a home study or submitting her fingerprints, the court allowed her to testify. Neither LCCS nor the GAL supported Jones' complaint. The evidence regarding Jones' request for legal custody is discussed in greater detail in T.B.'s second assignment of error.

{¶ 20} Finally, LCCS called the GAL. As part of his investigation, the GAL reviewed records from (1) T.B.'s previous loss-of-permanent-custody cases, (2) the two anonymous referrals in this case, (3) T.B.'s arson conviction, and (4) the civil protection order taken out against T.B. The GAL also met with T.B. and J.M. during a "Level I" visit about three weeks after LCCS took custody of J.M. The GAL described T.B. as "awkward" with the baby and observed T.B. "kind of yank[] on him" while changing his clothes and then put him in a chair that was not designed for a baby. In his report, which was admitted into evidence, the GAL noted that T.B. "is continuing to have contact with alleged father [and thus] has not remedied the concerns that brought her to the attention of the agency in the past."

9.

**{¶ 21}** As for J.M., the record established that the foster family where he was placed was willing to adopt him. J.M. was described as a "very social" baby who was "meeting his milestones" and physically healthy, despite a few ear infections. The GAL testified that he met with J.M. and his foster mother and that he maintains regular contact with her. The GAL concurred that J.M. is "doing well in her care," and he expressed "no concerns" about that placement. The GAL recommended that permanent custody of J.M. be granted to LCCS.

**{¶ 22}** At the conclusion of the hearing, the court terminated T.B. and Ja.M.'s parental rights and awarded permanent custody of the child to LCCS. In its September 27, 2018 judgment entry, the court found by clear and convincing evidence under R.C. 2151.414(B)(1)(a) that the child could not be placed with either parent in a reasonable time and should not be placed with either parent and that awarding permanent custody to LCCS was in J.M.'s best interest. In determining that J.M. could not and should not be placed with the parents, the court made findings pursuant to R.C. 2151.414 (E)(2), (10), and (11).

**{¶ 23}** As to Section (E)(2), the court found that T.B.'s chemical dependency issues are so severe that she is unable to provide an adequate permanent home for J.M. at the present time and as anticipated, within one year of the hearing.

**{¶ 24}** As to Section (E)(10), the court found that Ja.M., the alleged father, failed to have contact with J.M. for more than ninety days and his lack of visitation with the child demonstrates abandonment.

10.

{¶ 25} Finally, as to Section (E)(11), the court found that the parents had their parental rights involuntarily terminated with respect to four siblings of J.M.'s and that the parents failed to provide clear and convincing evidence to prove that, notwithstanding those prior terminations, that they could provide a legally secure permanent placement for J.M.

{¶ 26} Regarding the best interests of the child, the court found by clear and convincing evidence under R.C. 2151.414(D)(1)(a), (d), and (e) that it was in the best interest of J.M. to award permanent custody to LCCS. Specifically, the court found that the interaction between J.M. and his foster parents is positive and that he is doing well in the placement which includes his sibling; that J.M. is young and in need of a legally secure placement that cannot be achieved without a grant of permanent custody to LCCS. The court also found that both parents have had their parental rights terminated with respect to siblings; that Ja.M. abandoned J.M.; and that the continued residence in the home of either parent was contrary to the child's best interest and welfare due to the parents' failure to demonstrate a change in behavior and the parents' failure to be able to provide a safe and stable environment.

{¶ 27} The trial court also concluded that it was not in J.M.'s best interest to award legal custody of him to Jones and denied Jones' complaint.

{¶ 28} Through appellate counsel, T.B. appealed the judgments (regarding permanent custody and legal custody), and this court ordered that the appeals be consolidated. T.B. raises two assignments of error for our review.

11.

Assignment of Error I: The trial court's finding that the child could not be returned to mother within a reasonable time was against the manifest weight of the evidence.

Assignment of Error II: The trial court's finding that denying legal custody to a third party friend of mother's was in the child's best interest was against the manifest weight of the evidence.

## Law of Permanent Custody

{¶ 29} R.C 2151.414 establishes the analysis that a juvenile court must undertake when considering whether to terminate parental rights and vest permanent custody in a children services agency. Under that provision, the court must first find that one of the circumstances described in R.C. 2151.414(B)(1)(a)-(e) exists. Subsection (a) requires a finding that the child has not been abandoned or orphaned, has not been in the custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and cannot be placed with either parent within a reasonable time or should not be placed with either parent; subsection (b) requires a finding that the child is abandoned; subsection (c) requires a finding that the child is orphaned and there are no relatives who are able to take permanent custody; subsection (d) requires a finding that the child has been in the temporary custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period; and subsection (e) requires a finding that the child or another child the

12.

parent had custody of has been adjudicated abused, neglected, or dependent on three separate occasions.

{¶ 30} Where the court finds that R.C. 2151.414(B)(1)(a) applies, as it did in this case, it must consider whether granting permanent custody to the agency is in the child's best interest *and* whether any of the factors enumerated in R.C. 2151.414(E) are present that would indicate that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re B.K.*, 6th Dist. Lucas No. L-10-1053, 2010-Ohio-3329, ¶ 42-43. If the court finds that at least one factor in R.C. 2151.414(E) applies, it must then determine whether awarding permanent custody to the agency is in the child's best interest by considering the factors in R.C. 2151.414(D)(1).

{¶ 31} All of the court's findings under R.C. 2151.414 must be by clear and convincing evidence. "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re Tashayla S.*, 6th Dist. Lucas No. L-03-1253, 2004-Ohio-896, ¶ 14.

{¶ 32} We review a trial court's determination in a permanent custody case under a manifest-weight-of-the-evidence standard. *In re P.W.*, 6th Dist. Lucas No. L-12-1060, 2012-Ohio-3556, ¶ 20. In doing so, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest

miscarriage of justice that the decision must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). But, while we review the evidence and consider the witnesses' credibility, we must be mindful that the juvenile court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *P.W.* at ¶ 20. Its discretion in determining whether an order of permanent custody is in the best interest of a child "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." (Quotations omitted.) *In re C.P.*, 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 10.

### R.C. 2151.414(E) Findings

{¶ 33} In her first assignment of error, T.B. argues that the trial court's findings under R.C. 2151.414(E)(2) and (E)(11) are not supported by the manifest weight of the evidence. As discussed, because the trial court found that R.C. 2151.414(B)(1)(a) applies (i.e., that the child cannot or should not be placed with either parent), it was required to examine the R.C. 2151.414(E) factors. A court need only find one (E) factor present to support a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 50, citing *In re William S.*, 75 Ohio St.3d 95, 661 N.E.2d 738 (1996), syllabus.

14.

**{¶ 34}** R.C. 2151.414(E)(2) and (11) provide,

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or *chemical dependency* of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing. (Emphasis added.)

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, * * * and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

**{¶ 35}** T.B. argues that the record lacks clear and convincing evidence that she suffers from a "chronic mental illness or chemical dependency" that is so severe that it renders her unable to provide an adequate home. The trial court's findings, with respect to Section (E)(2), were limited to T.B.'s "chemical dependency"; it did not include T.B.'s alleged mental illness as a basis to find that J.M. cannot or should not be placed with her within a reasonable time, i.e., "The Court finds that, pursuant to [R.C.] 2151.414(E)(2), the chronic chemical dependency of the parent [T.B.] is so severe that * * *."

**{¶ 36}** In support of that finding, the court cited (1) "mother's continued use of marijuana * * * through the years even through prior permanent custody cases" and

15.

(2) T.B.'s arson offense, which occurred while she was under the influence of alcohol. The record supports the trial court's findings. Indeed, T.B. admits to using marijuana "frequently." And, while she did complete substance abuse treatment "in the past," LCCS put forth evidence that she was "re-referred back and then was not signing releases for [LCCS] to know of any progress being made and [she] *refused screens.*" (Emphasis added.)

{¶ 37} T.B. counters that J.M.'s "good condition" and the condition of the home (i.e., "clean and adequately furnished") counteracts the clear evidence of drug use at the time of the child's removal. A similar argument was made in *In re. M.M.*, 6th Dist. Wood No. WD-09-014, 2009-Ohio-3400, in which the mother claimed that "notwithstanding [her] marijuana use, she was providing her children with a clean and safe environment when [the agency] intervened [and that] there was a lack of evidence showing in any way that her drug abuse negatively impacted the children." *Id*. at ¶ 12. The evidence in that case established that the mother had a practice of engaging with a children's services agency, completing assessment for drug and alcohol abuse, failing to follow up on treatment and then, if she tested positive for drugs, fleeing to another state. This court found that the "children were removed because of [mother's] drug use and flight. The evidence clearly shows that this was a condition that appellant had not remedied by the time of the final hearing and it is undisputed that appellee provided diligent efforts to help her accomplish that remedy." *Id*. at ¶ 52. We reach the same result here and find that T.B.'s admitted use of marijuana and her refusal to release

16.

information and/or to submit to random urine screens indicate an unwillingness, if not an inability, to provide an adequate, permanent home for J.M. We find that the trial court's ruling with respect to Section (E)(2) is not against the manifest weight of the evidence.

{¶ 38} With respect to Section (E)(11), T.B. acknowledges that because she had parental rights terminated with respect to J.M.'s siblings, she had the burden to put forth clear and convincing evidence that she can provide a legally secure permanent placement and adequate care for J.M.'s health, welfare, and safety. *See In re R.S.,* 6th Dist. Lucas No. L-14-1156, 2014-Ohio-5815, ¶ 33-34. The trial court found that T.B. presented "no evidence to [rebut the presumption], none."

{¶ 39} On appeal, T.B. argues that "the health of the child at the time of removal," constitutes "clear and convincing evidence [that she made] significant improvements in her ability to care for herself and the child." We find that the testimony as to the condition of the home and J.M. does not constitute clear and convincing evidence that rebutted the presumption of parental unsuitability, especially in light of the considerable evidence in the record demonstrating that life for T.B. remained unchanged since her previous loss of parental rights. That is, she continued living (and fighting with) Ja.M., she was not receiving any mental health services despite longstanding mental health diagnoses, she had recently assaulted one person and committed arson as to another, and she was a regular user of illegal drugs. For these reasons, the ongoing caseworker, who worked with T.B. during this case and previous cases, testified that she had observed no improvement with regard to the domestic violence, mental health and substance abuse

17.

issues that caused her to lose custody in those previous cases. We find that competent, credible evidence in the record supports the trial court's determination by clear and convincing evidence of the existence of factor R.C. 2151.414(E)(11) in this case.

{¶ 40} Next, we address T.B.'s argument that the trial court applied Section (E)(12), without explicitly saying so. That section provides that, "[t]he parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing." Without citing any evidence, T.B. claims that the trial court "presume[ed]" that the mother would receive a sentence greater than 18 months (with respect to her arson conviction), which it then "incorporated" into its conclusion that the child could not be placed with her within a reasonable time.

{¶ 41} The record in this case does not disclose whether T.B. was sentenced to prison and/or if so, for what period of time. Based upon our review, the trial court did not find, either explicitly or implicitly, that Section (E)(12) was applicable. The only reference the trial court made to T.B.'s arson conviction pertained to her intoxication at the time she committed the offense (with respect to the court's (E)(2) finding) and the fact that she was "incarcerated * * * at the time of trial" which the court found relevant in finding that T.B. failed to rebut the presumption under Section (E)(11). The court's consideration of the offense was proper for those purposes, and we find no error.

18.

{¶ 42} Pursuant to the trial court findings under R.C. 2151.414(E)(2) and (11) as to T.B., we conclude that the trial court did not err in finding by clear and convincing evidence that J.M. "cannot or should not be returned to [her] within a reasonable period of time." For either or both reasons, we find that T.B.'s first assignment of error is not well-taken.

### Best Interest of the Child

{¶ 43} In her second assignment of error, T.B. argues that the trial court's decision—that it was in the child's best interest to deny Jones' complaint for legal custody—was against the manifest weight of the evidence. T.B. does not challenge the trial court's other best interest findings under R.C. 2151.414(D)(1)(a)-(e).

{¶ 44} R.C. 2151.353(A)(3) provides that if a child is adjudicated an abused, neglected or dependent child, the court may award legal custody of the child "to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child." R.C. 2151.353(A)(3). "Legal custody vests in the custodian the physical care and control of the child while residual parental rights and responsibilities remain intact." *In re M.M.*, 12th Dist. Fayette No. CA2010-12-034, 2011-Ohio-3913, ¶ 7; R.C. 2151.011(B)(17). Unlike permanent custody, granting legal custody does not terminate the parent-child relationship. *Id.*

{¶ 45} A juvenile court must base its custody determination under R.C. 2151.353 on the best interest of the children. "In making such a determination, courts have looked to the best interest factors of R.C. 2151.414(D), R.C. 3109.04(F)(1) [pertaining to shared

19.

parenting], a combination of the two, or general notions of what should be considered regarding the best interests of the [child]." (Quotation omitted.) *In re A.D.*, 6th Dist. Erie Nos. E-16-059, E-16-060, E-16-061, 2017-Ohio-6913, ¶ 32. "[A] trial court may award legal custody to a nonparent where it finds, by a preponderance of the evidence, that legal custody is in the child's best interests." *Id. at* ¶ 31. We review the trial court's decision awarding legal custody under an abuse of discretion standard. An abuse of discretion connotes that a trial court's attitude is unreasonable, arbitrary, or unconscionable. (Citations omitted.) *Id.* at ¶ 21.

{¶ 46} At trial, Jones testified that she is a licensed cosmetologist and friend of T.B. When asked if she understood that she would be expected to raise J.M. if her motion for legal custody was granted, Jones answered, "[o]kay. That's fine." In Jones' opinion, J.M. should not have been removed from T.B.'s care, and if granted custody, she would allow T.B. to "see" J.M. Jones lives with her two children and her boyfriend of three years. She did not deny a history of domestic violence in her own home but attributed it to her ex-husband, including an incident in which her daughter fell out of a car. Jones' criminal history includes a 2014 conviction for assault, stemming from an incident in which she hit a woman in the head with a hammer and a 2009 conviction for "attempt" which was amended down from a charge of domestic violence. Based upon her history of domestic violence, LCCS and the GAL urged the court to deny Jones' complaint. The GAL testified that he had "significant concerns" about her "protective

20.

capacity [from mother]" and that he feared that Jones "would turn around and give the child right back to mother."

{¶ 47} In denying Jones' complaint, the court found that Jones was not appropriate for custody of J.M. because (1) a home study had been completed; (2) the court questioned Jones' commitment to J.M. given that she failed to open her mail from LCCS for five weeks, until the day before trial; and (3) it was "convinced" Jones would return the child to T.B. We see no evidence that the trial court abused its discretion, especially in light of the trial court's extensive consideration of all the relevant factors in determining that an award of permanent custody to LCCS was in J.M.'s best interest. *Accord In re M.*, 1st Dist. Hamilton No. C-17008, 2017-Ohio-1431, ¶ 29 (Noting that it is a much more rigorous standard to grant permanent custody to a public children services agency than to grant legal custody to a non-parent).

{¶ 48} After reviewing the record, we find that LCCS presented clear and convincing evidence that supports the trial court's finding that awarding LCCS permanent custody was in J.M.'s best interest. Accordingly, we find that T.B.'s second assignment of error is not well-taken.

{¶ 1} Finally, T.B. argues for the first time in her reply memorandum that the trial court's finding—that J.M. was dependent and neglected—were against the manifest weight of the evidence.

{¶ 2} A party may not advance new arguments in its reply brief. *Am. Fiber Sys., Inc. v. Levin*, 125 Ohio St.3d 374, 2010-Ohio-1468, 928 N.E.2d 695, ¶ 21. *See also*

*Belcher v. Ohio State Racing Comm.*, 10th Dist. Franklin No. 03AP-786, 2004-Ohio-1278, ¶ 18 ("Inasmuch as this argument constitutes a new assignment of error, appellant was not entitled to raise it in his reply brief, and we are not required to address it."). While we are not required to consider T.B.'s argument, we find that the record contains some competent and credible evidence to support a finding that J.M. was dependent and neglected.

{¶ 3} A trial court determines dependency, neglect, and abuse cases by clear and convincing evidence. Juv.R. 29(E)(4). The determination must be made as of "the date specified in the complaint." R.C. 2151.23(A)(1).

{¶ 4} R.C. 2151.04(C) defines a "dependent child" as one "[w]hose condition or environment is such as to warrant the state, in the best interests of the child, in assuming the child's guardianship." In adjudicating J.M. as dependent, the court cited T.B.'s drug use, her loss of custody in previous cases, her failure to address her substance abuse, mental health, and domestic violence problems, and the two referral sources expressing concern for J.M. We find that the record contains clear and convincing evidence to support a finding of dependency as to J.M. *Accord In re Brown*, 5th Dist. Stark No. 2008CA00029, 2008-Ohio-3655, ¶ 17 (Dependency established where mother had already lost permanent custody of five other children due to long term substance abuse and lack of case plan compliance in previous court cases; mother was pregnant with her seventh child and tested positive for marihuana; alleged father was incarcerated and had

22.

effectively abandoned the child; and caseworker opined that child was at risk of future harm in light of mother's history and drug problems).

{¶ 5} The trial court also found that J.M. was "neglected." R.C. 2151.03(A)(3) defines a neglected child as one whose parent "refuses to provide proper or necessary * * * medical * * * care or treatment. Here, the court found that J.M. was neglected "strictly as to the issue of postpartum medical treatment." It found that "mother had not obtained medical care for the child since the child's birth," a period of nearly five months. T.B. admitted to this when she met with Murphy the day after the child's removal. "Withholding necessary medical treatment from a child is a form of neglect." *In re Ka.C.*, 8th Dist. Cuyahoga Nos. 102000, 102002, 102005, 102006, 2015-Ohio-1158, ¶ 23 ("The evidence also showed that mother was not ensuring that the children's medical needs were being met where one of the child's "severe allergies and eczema require him to see a dermatologist and a gastroenterologist in addition to his regular pediatrician [and] [y]et mother repeatedly failed to take him to his medical appointments."). T.B.'s failure to seek any medical care during his infancy put J.M. at risk of harm, especially considering that he was born in a hotel and was never evaluated or screened as a newborn. It bears repeating that T.B. placed her interests (of losing custody) ahead of J.M.'s well-being. We find that the trial court's finding that J.M. was dependent and neglected was not contrary to the manifest weight of the evidence.

23.

## Conclusion

**{¶ 6}** For the reasons expressed above, we find that the trial court's decision was supported by clear and convincing evidence and was not against the manifest weight of the evidence. We find that T.B.'s assignments of error are without merit. Therefore, the September 27, 2018 judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Pursuant to App.R. 24, costs of this appeal are assessed to T.B.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.       _____
JUDGE

Arlene Singer, J.       

_____
Christine E. Mayle, P.J.        JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.