[Cite as *In re M.M.*, 2023-Ohio-3963.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re M.M.                                    Court of Appeals No.  L-23-1133

                                              Trial Court No.  JC 22291650


                                              <u>**DECISION AND JUDGMENT**</u>

                                              Decided:  October 24, 2023

* * * * *

Rebecca L. West-Estell, for appellee.

Autumn D. Adams, for appellant.


* * * * *

**DUHART, J.**

**{¶ 1}** This is an appeal from the May 10, 2023 judgment of the Lucas County

Court of Common Pleas, Juvenile Division, terminating the parental rights of appellant,

K.J., the mother of M.M., and granting permanent custody of the child to appellee, Lucas

County Children Services ("LCCS" or "agency").  For the reasons that follow, we affirm

the judgment.

**{¶ 2}** Mother sets forth one assignment of error:

The finding of permanent custody being in M.M.'s best interest was against the sufficiency of the evidence because LCCS failed to show a link between Mother's learning disability and a danger to M.M. and that his placement into a home of strangers rather than his family was better for him.

## Background

**{¶ 3}** Mother and father, L.M., are the biological parents of several children, including M.M., who was born in early November 2022, and is the youngest child. At the time of M.M.'s birth, mother and father had an open case with LCCS ("the previous case") due to concerns with the parents' developmental delays and domestic violence.

**{¶ 4}** Regarding the previous case, LCCS became involved with the family in 2018, after one of the children broke his collarbone due to interaction with father. Charges were pressed against father, and a five-year civil protection order was put in place for the protection of mother and the children. On March 15, 2018, LCCS filed a complaint alleging physical abuse, domestic violence and neglect concerns with the children. In July 2018, legal custody of the oldest child was awarded to maternal grandmother. In September 2020, permanent custody of the two younger children was

2.

awarded to LCCS.[1]  The juvenile court found mother had failed to implement skills from parenting classes and domestic violence services, and due to chronic emotional illness and intellectual disability, mother was not able to provide an adequate permanent home for the children.  The court found father had abandoned the children and failed to visit or have any contact with the children since 2018, when the case opened.  The two younger children were adopted by one family.

{¶ 5} On the day of M.M.'s birth in early November 2022, LCCS received a referral alleging that the child was born in a certain hospital, mother has developmental delays, and she is unable to care for the child.  The referral further alleged that father was at the hospital and was acting "extremely hyper."

{¶ 6} On November 11, 2022, the juvenile court granted an ex parte order concerning M.M. to LCCS.  The next day, M.M. was discharged from the hospital. Shortly thereafter, M.M. was placed in a foster home, which is the same home where two of his brothers live.

{¶ 7} On November 14, 2022, a staffing meeting was held; mother and father were present.  LCCS expressed continuing concerns as to whether the parents were equipped to take care of a newborn baby.

---

[1] There appear to be typographical errors in the record concerning the number of mother's children involved in the previous case.  Having reviewed the record of the previous case, it is clear that there are three children.

3.

{¶ 8} On November 15, 2022, LCCS filed a complaint in dependency and motion for shelter care hearing regarding M.M. That same day, the shelter care hearing was held and mother consented to interim temporary custody of M.M. to LCCS.

{¶ 9} On November 17, 2022, the court appointed a guardian ad litem ("GAL") to represent M.M.

{¶ 10} On January 23, 2023, the GAL filed her report and recommendation. That same day, the adjudicatory hearing was held, which mother attended. The court found M.M. was a dependent child.

{¶ 11} On March 9, 2023, the permanent custody trial was held. Numerous people were present, including mother. The court announced its decision, awarding permanent custody of M.M. to LCCS for adoptive planning and placement. Mother appealed. Father did not appeal and is not a party to this appeal.

### The Permanent Custody Trial

{¶ 12} LCCS called the following witnesses to testify at trial: the ongoing LCCS caseworker, the GAL and the foster parents. Mother also testified at trial. The testimony relevant to mother's appeal is summarized below.

### Foster Mother

{¶ 13} The foster mother testified to the following. She has been M.M.'s foster mother since November 15, 2022, and she previously adopted his two siblings. M.M. is doted on by his two brothers, they read to him, hold him and play with him. The three

boys are really bonded. M.M.'s other brother, who does not live with the foster mother, visits his three brothers about every other weekend and loves to play with M.M., and dress the same way. M.M. is doing very well. If M.M. becomes available, she would like to adopt him.

{¶ 14} Foster mother talks with mother at visits. Mother has never missed a visit and there are no concerns with mother's care of M.M. during visits. Foster mother started to communicate with mother via email in February 2023, when contact was first allowed. Foster mother gives mother updates on the boys and shares pictures. Mother is respectful and appropriate in their conversations and definitely cares very deeply for the boys and loves them very much.

{¶ 15} As long as it is safe for the boys, foster mother thinks the biological family should be involved in the boys' lives. Foster mother notes that mother has gone out of her way to find resources to help.

**Foster Father**

{¶ 16} The foster father testified to the following. He said M.M.'s two brothers really like to hang out with M.M., read him books and hold him. The oldest of the two boys is very protective of his younger brothers. If M.M. were to become available, foster father would definitely be interested in adopting him.

{¶ 17} Foster father would be in favor of M.M. and his two brothers continuing their relationship with mother. At visits, mother coos at M.M. and definitely loves him.

**Caseworker**

{¶ 18} Katie Roepke, the ongoing LCCS current caseworker for M.M. testified to the following. She was not the caseworker for M.M.'s brothers, so the family is relatively new to her. However, she reviewed SACWIS (Statewide Automated Child Welfare Information System) notes, prior case plans and prior judgment entries.

{¶ 19} In the previous case, there were concerns with mental health, parenting abilities and domestic violence, as father was violent towards mother and the children. Mother worked on case plan services and completed parenting class and domestic violence classes. Following the trial, the juvenile court terminated mother and father's parental rights to the three children.

{¶ 20} In M.M.'s case, Roepke mentioned that mother always meets with her, keeps in constant contact and attends every visit with the child. Mother is respectful and there are no issues with communication or meetings. However, LCCS has concerns with mother. One of the concerns is with mother's mental health. During the case, she bounced around between mental health facilities, so Roepke suggested that mother pick one place so she could get really good care. Mother did choose one facility and has been participating in individual counseling.

{¶ 21} Another concern is mother's relationship with father. She completed domestic violence classes and got a protection order, but the order was violated as mother became pregnant by father. Parenting is also a concern. Mother tries her absolute best

6.

and really puts effort in, but she needs lots of prompting on certain tasks. It appears that mother's learning disability is a barrier for her parenting skills.

{¶ 22} Lastly, LCCS has concerns with mother's ability to protect M.M. from father. While mother completed the classes successfully, LCCS is assessing compliance versus change. Father has not completed classes for domestic violence batterers, so he did not have the opportunity to change his behavior, which places mother and the children at risk.

{¶ 23} Regarding communication between the foster/adoptive family and mother, Roepke did not see any safety risks with mother, as mother is not a threat.

{¶ 24} Mother cares deeply for the boys and loves them, but she has a comprehension issue, so she does not learn in the typical manner. Mother tried to take advantage of many parenting classes, but she cannot implement all of the skills which were taught.

{¶ 25} The agency is requesting permanent custody of M.M. so that he can be adopted into the same family as two of his brothers. Roepke opined it was in M.M.'s best interest for LCCS to have permanent custody because she believes that mother cannot safely parent. M.M. currently lives in the foster home which is safe, all of M.M.'s needs are met, and he is reaching all of his developmental milestones.

7.

**Mother**

{¶ 26} Mother testified to the following. She heard while she was in school that she has a learning comprehension problem, but it only affects math and "some stuff I have in school I wasn't able to keep up with." She does not think this problem affects her daily living or parenting her children. She asks questions over and over again to get a better understanding.

{¶ 27} Concerning the previous case, mother took and completed three parenting classes, but she might not have completed one class because she tore her ACL and was not able to get there.

{¶ 28} Mother recently tried to take other parenting classes, and she learned some things that she tried to use on M.M. At visits, a person from Help Me Grow is there and tells mother about different milestones and she learns different activities. Mother loves M.M. and does not understand "why they just keep taking my children from me. * * * I raised my younger three on my own very good until I got the case with [her injured child] and I never had no concerns doing it on my own." She loves her children and has no intention of doing anything harmful to them.

{¶ 29} Mother is establishing a relationship with the foster parents and they want her involved in the children's lives. She understands that father might be an issue of concern "[b]ecause he fractured my son's collarbone." Prior to mother's pregnancy with

8.

M.M., father did not live with her, and since she had M.M., she does not have contact at all with father and she does not let him know where she stays.

{¶ 30} Mother has independent housing. For support, mother has her church, as the people from church help her. She acknowledged the church people do not live with her.

## GAL

{¶ 31} Robin Fuller, the GAL, testified to the following. She has seen M.M. once at the foster home, but she has been to the foster home many times, so she knows they are very good with the children. She has spoken with the foster mother about M.M., and was told he is doing really well. She has also seen M.M. at visits with mother twice, and Fuller has been to mother's apartment. There was no furniture in the apartment, just an air mattress, but the apartment was clean. Mother has a dog.

{¶ 32} Fuller acknowledges that mother loves M.M., but there are concerns about mother's ability to parent the child. Mother has learning disabilities which are a barrier and do not allow her to safely protect and care for M.M. Fuller observed this in the previous case with mother's other children.

{¶ 33} Fuller was the GAL in the previous case involving M.M.'s siblings. She has observed mother and parenting on numerous occasions, and opines that mother is not able to safely care for the children.

9.

**Juvenile Court's Decision**

{¶ 34} In its May 10, 2023 judgment entry, the court took judicial notice of the adjudicative facts of the case, and considered all of the admissible and relevant evidence. The adjudicative facts mentioned by the court included the previous case, where there were concerns that the three oldest children were subjected to physical abuse, domestic violence and neglect by the parents. Other evidence cited by the court in M.M.'s case was the testimony of the GAL, who participated in M.M.'s case and the previous case, that there were the same concerns in both cases regarding mother's ability to parent a child safely. The court in M.M.'s case noted the court in the previous case found that mother failed to implement skills from parenting classes and domestic violence services, and due to chronic emotional illness and intellectual disability, mother was unable to provide an adequate permanent home for a child.

{¶ 35} The court in M.M.'s case found, by clear and convincing evidence, that under R.C. 2151.414(B)(1)(a), M.M. cannot be placed with either parent within a reasonable time, and should not be placed with either parent.

{¶ 36} The court further found that pursuant to R.C. 2151.414(D)(1), it was in M.M.'s best interest to grant permanent custody to LCCS for adoptive planning and placement. The court found, pursuant to R.C. 2151.414(D)(1)(a), the caseworker and GAL testified that M.M. is placed in an appropriate foster home which is meeting all of his needs, he is placed in the adoptive home of two his biological siblings and is bonded

10.

with them, and the foster family is willing to adopt M.M., which would provide the opportunity for M.M. to grow up in the same home as two of his brothers.

{¶ 37} The court also found that under R.C. 2151.414(D)(1)(d), M.M. needs a legally secure permanent placement which cannot be achieved without a grant of permanent custody to LCCS. In addition, the court found that under R.C. 2151.414(D)(1)(e), the factors in R.C.2151.414(E)(11) apply, as mother had her parental rights involuntarily terminated with respect to M.M.'s siblings and mother failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, she can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of M.M. The court further found: caseworker Roepke testified that mother previously lost legal custody of one of her children to a relative, and lost permanent custody of two other siblings; the GAL testified that she was the GAL in the previous case, and the same concerns for mother's ability to parent safely continue to be present; and mother conceded that she lost permanent custody of three of her children because of parenting concerns.

{¶ 38} The court further found that under R.C. 2151.414(E)(2), chronic mental illness and intellectual disability of mother is so severe that it makes her unable to provide an adequate permanent home for M.M. at the present time and, as anticipated, within one year after the court holds the hearing pursuant to R.C. 2151.414(A) or for the

11.

purposes of R.C. 2151.353(A)(4). The court noted that the casework and GAL testified that mother has cognitive delays which make it difficult for her to parent the child.

{¶ 39} The court found that LCCS made reasonable efforts: to implement and finalize a permanent plan, by offering case plan services to the parents in the previous case that were designed to remedy the issues that led to the removal of the children and to reunify the family, and by identifying an alternative permanent plan of permanent custody and adoption for the child.

**The Appeal**

{¶ 40} Mother argues in her sole assignment of error that the juvenile court's finding that permanent custody is in M.M.'s best interest was against the sufficiency of the evidence as LCCS failed to show a link between her learning disability and a danger to M.M., and that his placement in a home of strangers rather than his family was better for him.

{¶ 41} Mother asserts that LCCS failed to present any evidence that her intellectual disability did or would jeopardize M.M.'s safety. She notes the court found by clear and convincing evidence that M.M. could not or should not be placed with mother because of her intellectual disabilities and her loss of parental rights to other children. Mother argues however, the only evidence of her delays were the caseworker and GAL's testimonies that mother seems to need things repeated to her several times.

12.

She insists that no IEP was introduced, nor was there evidence of mother's IQ or functioning ability.

{¶ 42} Mother contends the caseworker testified she was worried mother might not be able to parent M.M. as mother needs prompts on certain tasks, but no specific tasks were mentioned. There was no testimony that mother cannot change a diaper, or recognize when M.M. is hungry and needs to be fed, or recognize when M.M. needs comfort or needs to go to the doctor. Nor was there testimony that any cognitive delay mother has would jeopardize M.M.'s health, safety and welfare. She insists all of the caseworker and GAL's statements were personal opinions about how they believe a child should be raised, which is not sufficient to prove by clear and convincing evidence that mother is incapable of raising M.M.

{¶ 43} Mother further submits the court stated it was in M.M.'s best interest to be placed with his biological siblings, yet the caseworker and GAL indicated that mother lost permanent custody of the other children, meaning under the law she is no longer their mother, and by extension those children are no longer M.M.'s biological siblings.

{¶ 44} Mother claims LCCS failed to meet its burden, by clear and convincing evidence, as it did not present any evidence of her disability or how it affects her parenting abilities.

13.

## Law

## Standard - Permanent Custody

{¶ 45} We review a juvenile court's decision in a permanent custody case under a manifest-weight-of-the-evidence standard. *In re J.M.*, 6th Dist. Lucas No. L-18-1212, 2019-Ohio-801, ¶ 32. "In doing so, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed." *Id.*, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 46} "Every reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19, 526 N.E.2d 1350 (1988). "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Hence, a judgment supported by some competent, credible evidence going to all essential elements of the case is not against the manifest weight of the evidence. *Id.*; *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

14.

**{¶ 47}** The juvenile court may terminate parental rights and grant permanent custody of a child to a children services agency if it finds clear and convincing evidence of both prongs of the permanent custody test: (1) the existence of at least one of the four factors set forth in R.C. 2151.414(B)(1)(a) - (d), and (2) the child's best interest is served by granting permanent custody to the agency. *In re M.B.*, 10th Dist. Franklin No. 04AP755, 2005-Ohio-986, ¶ 6. Specific best interest factors which the juvenile court must consider, if relevant, are set forth in R.C. 2151.414(D)(1).

**First Prong**

**{¶ 48}** The juvenile court found that R.C. 2151.414(B)(1)(a) applies. That statute provides that "the child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent." R.C. 2151.414(E) also applies and states that "[i]f the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section * * * that one or more of the following [16 factors] exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent[.]" The factors are set forth in R.C. 2151.414(E)(1) through (16).

**{¶ 49}** Relevant here, R.C. 2151.414(E)(2) provides

Chronic mental illness, chronic emotional illness, intellectual disability * * * of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as

15.

anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code.

**{¶ 50}** R.C. 2151.414(E)(11) states:

The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, * * * and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

**{¶ 51}** R.C. 2151.414(E)(11) places "a burden on the parent to essentially rebut a presumption that, because her parental rights were involuntarily terminated as to her other children, she is not a suitable parent for additional children." *In re E.A.*, 9th Dist. Medina No. 12CA0059-M, 2012-Ohio-5925, ¶ 14. *See also In re N.J.*, 6th Dist. Lucas No. L-23-1114, 2023-Ohio-3190, ¶ 44. Moreover, "[a] finding that a parent has lost parental rights to another child applies to both prongs of the permanent custody analysis - whether a child cannot or should not be placed with either parent, R.C. 2151.414(E)(11), and whether permanent custody to the agency is in the child's best interest, R.C. 2151.414(D)(1)(e)." *In re N.J.* at ¶ 44, citing *In re W.M.*, 6th Dist. Lucas No. L-22-1016, 2022-Ohio-1978, ¶ 52.

16.

**{¶ 52}** Clear and convincing evidence requires proof which "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

**Second Prong**

**{¶ 53}** R.C. 2151.414(D)(1) sets forth the best interest factors which a court shall consider, if relevant:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers * * * and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed * * * through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

17.

**Analysis**

**{¶ 54}** Upon review, we observe that mother argues the juvenile court's finding that permanent custody is in M.M.'s best interest was against the sufficiency of the evidence. As set forth above in *In re J.M.*, the standard which we apply is manifest-weight-of-the-evidence. We also note that mother does not challenge the juvenile court's finding regarding the first prong of the permanent custody test, but directs her arguments solely on the second prong, the best interest of the child.

**{¶ 55}** The bulk of mother's best interest arguments focus on LCCS's failure to show a link between her learning disability and danger to M.M., as she claims the only evidence of her learning delay was offered in testimony by the caseworker and GAL that mother seems to need things repeated to her several times. Mother claims no testimony that any of her cognitive delays would jeopardize M.M.'s health, safety and welfare was presented. Rather, the caseworker and GAL offered personal opinions about how they believe a child should be raised, which opinions were not clear and convincing evidence that mother is incapable of raising M.M.

**{¶ 56}** While mother does not contest the juvenile court's finding as to the first prong of the permanent custody test, we find it necessary to address. Our review of the record shows the court found that R.C. 2151.414(B)(1)(a) applied, and R.C. 2151.414(E)(2) and (11) existed. We note that the court was only required to find that one factor existed. The court found, by clear and convincing evidence, that under R.C.

18.

2151.414(B)(1)(a), M.M. could not be placed with either parent within a reasonable time, and should not be placed with either parent. The court then determined, under R.C. 2151.414(E)(11),[2] that mother's parental rights to M.M.'s older siblings had been involuntarily terminated, a fact that mother did not dispute. The court set forth reasons supporting its findings.

{¶ 57} R.C. 2151.414(E)(11) then places the burden on mother to prove, by clear and convincing evidence, that she can provide a legally secure permanent placement and adequate care for M.M.'s health, welfare and safety. The juvenile court found that mother failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, she can provide a legally secure permanent placement and adequate care for the health, welfare and safety of M.M. We note that the GAL's testimony and mother's own testimony (that she does not understand why they just keep taking her children from her) provide support for the court's finding.

{¶ 58} On the authority of *In re N.J.*, which states that a finding that mother lost parental rights to other children applies to both prongs of the permanent custody test, we conclude that permanent custody of M.M. to LCCS is his best interest.

{¶ 59} Based on the foregoing, we find that mother failed to demonstrate that the juvenile court lost its way by concluding that permanent custody of M.M. to LCCS was in the best interest of M.M. We therefore conclude the juvenile court's judgment

---

[2] We choose to only address this factor.

19.

terminating mother's parental right to M.M. and granting permanent custody of M.M. to LCCS is supported by competent, credible evidence and is not against the manifest weight of the evidence. Accordingly, mother's assignment of error is found not-well taken.

{¶ 60} On consideration whereof, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Mother is ordered to pay the court costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Christine E. Mayle, J.       _____
                  JUDGE
Myron C. Duhart, P.J.

                _____
Charles E. Sulek, J.        JUDGE
CONCUR.

                _____
                  JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.