**[Cite as *In re N.J.*, 2023-Ohio-3190.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re N.J.

Court of Appeals No.  L-23-1114

Trial Court No.  JC 22292011

**DECISION AND JUDGMENT**

Decided:  September 8, 2023

\* \* \* \* \*

Rebecca West-Estell, for appellee.

Laurel A. Kendall, for appellant.

\* \* \* \* \*

**SULEK, J.**

{¶ 1} Appellant-mother, J.J. appeals the April 10, 2023 judgment of the Lucas

County Court of Common Pleas, Juvenile Division, granting appellee Lucas County

Children Services' ("LCCS") original motion for permanent custody of her son, N.J., and

terminating her parental rights.[1]  Because the juvenile court's determination that permanent custody to LCCS was in the child's best interest was supported by clear and convincing evidence, we affirm.

## I. Facts and Procedural Background

{¶ 2} On December 13, 2022, LCCS filed a complaint in dependency, neglect, and abuse and motion for permanent custody.  The complaint alleged that mother had lost permanent custody of two prior children due to issues with substance abuse, mental health, domestic violence, parenting, and home stability.  LCCS alleged that it received a referral in this case shortly after N.J.'s birth.  Mother tested positive for marijuana on the day she gave birth and admitted to using it throughout her pregnancy.

{¶ 3} LCCS requested that the court schedule an adjudication hearing within 30 days and find N.J. a dependent, neglected, and abused child and immediately proceed to a dispositional hearing.  LCCS requested that the court find that N.J. cannot or should not be placed with either parent within a reasonable time and that an award of permanent custody to LCCS is in the child's best interest.  On December 13, 2022, the juvenile court issued an ex parte order granting LCCS shelter care custody of N.J.  A case plan was filed on December 29, 2022.

{¶ 4} At the February 21, 2023 adjudication hearing LCCS intake investigator, Nona Mason, testified that following N.J.'s birth, LCCS received a referral after mother

---

[1] Alleged father, J.M., is not a party to this appeal.

2.

tested positive for marijuana and because additional children had been removed from mother's care. Mason spoke with mother at the hospital. Mother admitted to smoking marijuana during her pregnancy to treat her Lupus condition because she could not take her prescription medication during her pregnancy

{¶ 5} Mason stated that mother wished to engage in agency services in order to keep custody of N.J. and that she had prepared for and was ready to care of N.J. Mother indicated that she had previously been in therapy and that she was living with her current boyfriend who was not N.J.'s father.

{¶ 6} Mason acknowledged that mother had previously lost permanent custody of two children and legal custody of one child to his father. Mason testified that in 2021, mother completed the domestic violence and parenting components of the prior case plan but failed to engage in mental health treatment and continued to use illegal substances.

{¶ 7} LCCS caseworker, Kim Casdorph, testified that she had prior involvement with the family and interviewed mother at the hospital. Mother told Casdorph that she was employed at two jobs, was attending therapy, and had a psychiatric evaluation within the past 90 days and was not prescribed any psychotropic medication. Mother admitted to smoking marijuana during her pregnancy; she stated that she did so in lieu of taking her Lupus medication which would have harmed N.J. Casdorph testified that N.J.'s umbilical cord tested positive for marijuana.

3.

{¶ 8} The juvenile court magistrate then concluded that N.J. was an abused and neglected child. The finding was reflected in the magistrate's February 21, 2023 judgment entry. Specifically, the magistrate found that mother tested positive for marijuana at N.J.'s birth and had lost permanent custody of two children to LCCS. On March 13, 2023, the court adopted the magistrate's decision

{¶ 9} At the March 7, and March 24, 2023, permanent custody hearings, foster mom, B.G., testified that N.J. was placed with her within days of his birth and is healthy and happy. She stated that N.J. was born with clubfoot for which he is receiving treatment. He was meeting all his developmental milestones. B.G. stated she and her husband would petition the court to adopt N.J if they have the option to do so.

{¶ 10} Foster father, L.G., testified that he transported N.J. to LCCS for weekly hour-long visits with mother. Mother was frequently 10 to 15 minutes late and completely missed three visits. L.G. acknowledged that during visits mother inquired of and was updated regarding N.J.'s health and well-being, including his clubfoot treatment.

{¶ 11} L.G. testified that he and B.G. have four biological children who love and interact with N.J. He testified that the couple's intent was to petition the court for adoption.

{¶ 12} LCCS caseworker, Katie Roepke, testified that she was assigned to the family following N.J.'s birth and the agency's assessments. She informed mother that due to the fact that she lost permanent custody of a child to LCCS less than one year ago,

4.

and that she lost permanent custody of two children to LCCS and one with legal custody being awarded to the child's father, LCCS would recommend that it be awarded permanent custody. No case plan services were being offered.

{¶ 13} Roepke testified that mother informed her that she was engaged with mental health services and was in the process of obtaining housing. Roepke independently corroborated that mother was engaged in therapy services and learned that she had been taking medications but once her psychiatrist left the practice, she did not engage a new one. Roepke was also informed that mother missed several therapy appointments and was nearly discharged. Mother promised to attend once a month though the therapist thought weekly or bi-weekly appointments were optimal. Mother also failed to engage with a case manager.

{¶ 14} Mother's therapist indicated to Roepke that mother believes that she does not need medication. Roepke and mother discussed her habit of self-medicating with marijuana. Mother agreed that she needed to work on her marijuana use. Roepke stated that mother has submitted to a few random urine screens, despite her request for monthly screens, and that they have been positive for marijuana.

{¶ 15} Roepke further testified that mother's history with LCCS spans 2015 through 2021. Roepke stated that mother lost permanent custody of two prior children based on reasons identical to the present ones—mental health and substance abuse concerns. Roepke acknowledged that mother has stable housing.

5.

{¶ 16} According to Roepke, N.J. is doing very well in foster care and is bonded and well-adjusted. She stated that the foster parents properly care for him and address his medical needs. The foster parents had also begun preplacement visits with N.J.'s biological sibling, also in LCCS custody, with the hope that they could adopt both children. Roepke had no concerns with mother and N.J.'s interactions

{¶ 17} Roepke believed that the agency should receive permanent custody of N.J. because mother lost permanent custody of a child less than a year ago based on the same issues and that mother has not demonstrated "significant change" to recommend reunification.

{¶ 18} Mother presented the testimony of her mother, T.B. T.B. stated that mother is her oldest daughter of nine children and that she never observed any neglectful of inappropriate interactions with mother's siblings, who she babysat for over several years, or her own children.

{¶ 19} T.B. testified that mother completed all the case plan services in her prior cases, is attending therapy, and has housing. She indicated that mother lives next door and she has observed her as being clean and sober. T.B. stated that following a shoulder surgery, mother had temporarily stopped taking her mental health medication. T.B. stated that she can assist mother with N.J.'s care.

{¶ 20} T.B. agreed that mother was convicted of child endangering, as to mother's oldest child, while living in T.B.'s home. She lost custody of that child to his father.

6.

{¶ 21} T.B. admitted her recent involvement with LCCS; the referral had just been closed. She stated that she could not take custody of N.J. because she cares for her schizophrenic sister in the home. Upon further questioning, T.B. agreed that she and mother had a past domestic violence incident. She stated that it involved a verbal altercation.

{¶ 22} Mother's friend, C.W., testified that mother lived with her for a period, that LCCS had placed mother's second child in her care, and that visitation with mother's third child also took place at her home. C.W. observed mother interacting with her and C.W.'s children and had no concerns. C.W. denied seeing any abusive behavior or any indication that mother was under the influence of drugs.

{¶ 23} C.W. testified that mother cared for her children when she was out of town and there were no issues. C.W. stated that mother has never been given a chance to prove that she is a fit parent.

{¶ 24} Mother testified that she began seeing her current therapist telephonically during the COVID shutdown and that, although arranged through a local agency, she was not located in Toledo. All of their communications have been electronic, some through a video app. Mother stated that she has continued with therapy even without LCCS involvement and will continue because she wants to do anything possible to keep her son.

{¶ 25} Mother testified that she leases a two-bedroom house where she lives alone. She stated that she has two beds waiting for her older children and clothes in their dresser "like they're coming home."

{¶ 26} As to the services she engaged in through LCCS, mother stated that she lost custody of her first child to his father before any services could be offered. In 2019, as to her second child, LCCS requested that mother find housing and attend mental health counseling, parenting and domestic violence classes. Mother stated that she complied with all of LCCS' requirements and was generally consistent with visitation.

{¶ 27} Mother was pregnant with Child 3 during LCCS' involvement with Child 2. Following his birth, LCCS removed him due to marijuana in mother's system. Drug abuse counseling was included in the case plan. Mother testified that she is now clean and sober.

{¶ 28} As to N.J., mother acknowledged that no case plan services were being offered but that she completed the prior services and was still in counseling. Mother stated that her marijuana use was the only issue she did not fully address; she admitted to continued use following N.J.'s birth. Mother stated that she would resume taking her prescribed antidepressant once her shoulder healed from surgery.

{¶ 29} Finally, the guardian ad litem ("GAL") testified. In addition to her written report, the GAL testified that she had observed N.J. with mother and that she is very caring. The GAL also observed that N.J. and his foster parents and their children are

8.

very bonded and his needs are being met. She noted that N.J.'s foster parents are interested in adopting him should he become available.

{¶ 30} The GAL testified that she believes that permanent custody of N.J. to LCCS is in his best interest because of mother's struggles with attending mental health counseling and her consistent positive marijuana screens. The GAL stated that she was also the appointed GAL in mother's prior LCCS cases.

{¶ 31} The GAL testified that her concern regarding mother's mental health was evidenced at a home visit where mother had the home ready for the return of the two children of which she lost permanent custody. Mother's preparations included beds, dressers, and clothing.

{¶ 32} Following the permanent custody hearing, the juvenile court entered its judgment terminating mother's parental rights and awarding permanent custody of N.J. to LCCS. Applying R.C. 2151.414(B)(1)(a) and R.C. 2151.414(D)(1), the court found by clear and convincing evidence that N.J. cannot and should not be placed with mother within a reasonable time and that is in N.J.'s best interest to grant permanent custody to LCCS.

{¶ 33} Specifically, under R.C. 2151.414(E)(1), the court found that mother had failed to remedy the problems that initially caused N.J. to be placed outside the home. Under R.C. 2151.414(E)(4), that mother had demonstrated a lack of commitment to N.J. by using marijuana during and after her pregnancy, by failing to use prescribed

9.

medication to manage her mental health, by failing to consistently contact her LCCS caseworker, and her frequently late arrivals at visitation. Finally, under R.C. 2151.414(E)(11), the court concluded that mother has had her parental rights terminated as to a sibling of N.J. and has failed to demonstrate that she can adequately provide for N.J.'s health and safety.

{¶ 34} The court found that under R.C. 2151.414(D)(1), it was in N.J.'s best interest to award permanent custody to LCCS for adoptive placement and planning. The court based its conclusion on finding that N.J. is in an appropriate foster home where the fosters parents are willing to adopt, R.C. 2151.414(D)(1)(a), that the child deserves a legally secure placement, R.C. 2151.414(D)(1)(d), and that under R.C. 2151.414(D)(1)(e), R.C. 2151.414(E)(11) applies.

{¶ 35} The court then concluded that LCCS made reasonable efforts to finalize a permanent plan and it made reasonable efforts to identify an alternative permanent placement for N.J.

## II. Assignment of Error

{¶ 36} Mother has timely appealed the judgment terminating her parental rights and raises the following assignment of error:

1. The trial court abused its discretion by finding that, notwithstanding the prior terminations, mother failed to prove that she

10.

could provide a legally secure permanent placement and provide adequate care for this child pursuant to R.C. 2151.414(E)(11).

### III. Analysis

{¶ 37} In her sole assignment of error, mother challenges the trial court's reliance on R.C. 2151.414(E)(11) in granting permanent custody to LCCS. Mother contends that despite the prior permanent custody terminations, clear and convincing evidence did not support termination of parental custody as to N.J.

{¶ 38} A decision to terminate parental rights in a permanent custody case will not be reversed unless it is against the manifest weight of the evidence. *In re L.H.*, 6th Dist. Lucas No. L-22-1078, 2022-Ohio-3263, ¶ 20, citing *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11. Reversal is proper only where its determined, after weighing the evidence and all reasonable inferences including the credibility of the witnesses, that the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. *In re T.J.*, 2021-Ohio-4085, 180 N.E.3d 706, ¶ 40 (6th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 39} In addition, as the trier of fact a trial court is in the best position to weigh the evidence and evaluate the testimony. *In re A.H.* at ¶ 11, citing *In re Brown*, 98 Ohio App.3d 337, 342, 648 N.E.2d 576 (3d Dist.1994). "Thus, 'in determining whether the judgment below is manifestly against the weight of the evidence, every reasonable

11.

intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.'" *In re S.S.*, 6th Dist. Lucas No. L-22-1219, 2023-Ohio-1663, ¶ 28, quoting *In re W.M.*, 6th Dist. Lucas No. L-22-1016, 2022-Ohio-1978, ¶ 42.

{¶ 40} A juvenile court must find by clear and convincing evidence that terminating parental rights and awarding permanent custody to a children services agency satisfies the permanent custody test set forth in R.C. 2151.414. *In re Z.C.*, 6th Dist. Huron Nos. H-20-020, H-20-021, 2021-Ohio-763, ¶ 22, citing *In re B.K.*, 6th Dist. Lucas No. L-17-1082, 2017-Ohio-7773, ¶ 16. Clear and convincing evidence is defined as "'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 41} R.C. 2151.414(B)(1)(a) provides that a trial court may grant permanent custody of a child to the agency if it finds that, in addition to the placement being in the best interest of the child:

> The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive

12.

twenty-two-month period, * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

**{¶ 42}** R.C. 2151.414(E) requires a trial court to find that a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with either parent if any of 16 factors are met. "Under R.C. 2151.414(E), the existence of 'any one' of the factors listed in the statute is sufficient to support a finding that children cannot be placed with their parents within a reasonable time or should not be placed with their parents." *In re C.J.*, 6th Dist. Lucas No. L-13-1037, 2013-Ohio-3056, ¶ 28. Here, as to mother the court found that R.C. 2151.414(E)(1), (4) and (11) applied. These sections provide:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child

13.

when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

{¶ 43} If the trial court determines that any provision enumerated in R.C. 2151.414(B)(1) applies, the trial court must then determine, by clear and convincing evidence, whether granting the agency permanent custody of the child is in the child's best interest. *In re T.J.*, 2021-Ohio-4085, 180 N.E.3d 706, at ¶ 38, citing *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 26. In making this determination, R.C. 2151.414(D)(1) directs the juvenile court to consider the following non-exclusive factors:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

14.

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶ 44}** In the present case, mother does not dispute that she has previously had her parental rights terminated with respect to two of the child's siblings. A finding under R.C. 2151.414(E)(11) places "the burden is on the parent to provide clear and convincing

15.

evidence to prove that he or she can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child." *In re J.H.*, 8th Dist. Cuyahoga No. 105055, 2017-Ohio-940, ¶ 22, citing *In re E.A.*, 9th Dist. Medina No. 12CA0059-M, 2012-Ohio-5925, ¶ 14; *In re Y.W.*, 6th Dist. Lucas No. L-17-1215, 2018-Ohio-325, ¶ 39. A finding that a parent has lost parental rights to another child applies to both prongs of the permanent custody analysis—whether a child cannot or should not be placed with either parent, R.C. 2151.414(E)(11), and whether permanent custody to the agency is in the child's best interest, R.C. 2151.414(D)(1)(e). *In re W.M.*, 6th Dist. Lucas No. L-22-1016, 2022-Ohio-1978, ¶ 52; *In re Y.W.*, 3d Dist. Allen No. 1-16-60, 2017-Ohio-4218, ¶ 13.

{¶ 45} Mother argues that the court erred by failing to find that despite prior terminations, mother demonstrated that she can provide a legally secure placement and properly care for N.J. Mother supports her argument by attempting to distinguish an Eighth Appellate District case where the court relied, in part, upon R.C. 2151.414(E)(11) to support its decision to award permanent custody to the agency. *In re K.R.*, 8th Dist. Cuyahoga No. 112036, 2023-Ohio-936.

{¶ 46} In *In re K.R.*, mother's parental rights were terminated as to three of her children after she failed to participate in drug treatment, complete a mental health assessment, and, despite two parenting programs, she failed to demonstrate that she could properly care for her children. *Id.* at ¶ 3-5. Less than one year later, the agency received

16.

a referral following the birth of mother's fourth child and the agency filed a complaint in dependency and a motion for permanent custody. *Id.* at ¶ 6.

{¶ 47} Following the adjudication and disposition hearings, the juvenile court granted the agency's motion for permanent custody finding several factors under R.C. 2151.414(E). On review, the appellate court's analysis focused on the findings under R.C. 2151.414(E)(1) and (11). *Id.* at ¶ 35. The court concluded that the child was removed from the home because mother did not remedy the issues which caused the removal of her other children. *Id.* at ¶ 36. This supported the finding that mother also failed to rebut the presumption under R.C. 2151.414(E)(11) that despite a prior termination she was now able to care for her child. *Id.* at ¶ 39.

{¶ 48} Here, mother argues that unlike the mother in *K.R.*, whose failure to comply with essentially any of the case plan requirements resulted in the termination of her parental rights, the court's findings in this case are not supported by clear and convincing evidence. We disagree. The statutory factors that a juvenile court is required to consider when making an award of permanent custody are not exclusive and the combination of factors supporting the permanent custody decision is unique to each case.

{¶ 49} Although the record demonstrates that mother obtained appropriate housing, mother admitted that she has not addressed her substance abuse issues, she has failed to attend mental health counseling at the frequency recommended and has missed multiple appointments. Mother failed to re-engage with a new psychiatrist to prescribe

17.

and monitor medication. Further, although she lives next door to her mother, T.B., the pair were involved in a prior domestic violence incident. T.B. has also had a case with LCCS regarding her own children. Thus, the record demonstrates by clear and convincing evidence that N.J. cannot or should not be placed with mother within a reasonable time period.

{¶ 50} Finally, as to the court's findings that an award of permanent custody to LCCS is N.J.'s best interest, the record supports the court's finding that his needs are being met in his foster home, he is bonded with the family, and his foster parents are willing to adopt. Accordingly, the juvenile court's findings are supported by clear and convincing evidence. Mother's assignment of error is not well-taken.

### IV. Conclusion

{¶ 51} For the foregoing reasons, the April 10, 2023 judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Mother is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

18.

Thomas J. Osowik, J.                    _____
                                                              JUDGE
Gene A. Zmuda, J.

                                        _____
Charles E. Sulek, J.                                          JUDGE
CONCUR.

                                        _____
                                                              JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.