[Cite as *In re A.J.*, 2024-Ohio-280.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re A.J., S.H., K.H.

Court of Appeals No.  L-23-1189

Trial Court No.  JC 22288344

## DECISION AND JUDGMENT

Decided:  January 22, 2024

* * * * *

Rebecca L. West-Estell, for appellee.

Autumn D. Adams, for appellant.

* * * * *

**ZMUDA, J.**

## I.      Introduction

**{¶ 1}** This matter is before the court on appeal from the judgment of the Lucas County Court of Common Pleas, Juvenile Division, denying the request for continuance of appellant, S.P., the father of S.H., and granting permanent custody of S.H., (d.o.b. 10/7/16) to Lucas County Children Services.  Finding no error, we affirm.

## II. Facts and Procedural Background

{¶ 2} Lucas County Children Services (LCCS or the Agency) had a history with the mother of S.H., and S.H. and her siblings were previously adjudicated dependent and neglected in 2019, with protective supervision lasting until 2021. In January 2022, LCCS received a new referral alleging mother was using illicit drugs and S.H. and a sibling were not attending school, with another sibling left in the care of "some lady." On March 4, 2022, the juvenile court granted the petition for access filed by LCCS after mother refused to cooperate with the investigation. When mother continued to resist the investigation, LCCS filed a complaint in dependency and neglect on March 11, 2022.

{¶ 3} On March 11, 2022, the juvenile court held an emergency shelter care hearing. Mother and appellant did not appear at hearing. The juvenile court appointed counsel for mother and LCCS indicated it was unable to locate appellant. The juvenile court awarded interim temporary custody of S.H. and her siblings to LCCS and appointed a court-appointed special advocate (CASA)/ guardian ad litem for the children. An attempt to serve appellant with a copy of the juvenile court's March 11, 2022 order by certified mail to a Mansfield address was unsuccessful, with certified mail returned as refused.

{¶ 4} On April 13, 2022, summons issued to appellant for personal service at a new address, on Lawrence Avenue. On April 26, 2022, summons returned with failure of service, noting service as refused.

2.

{¶ 5} On April 26, 2022, the CASA filed her report and recommendations, and on May 11, 2022, LCCS filed its case plan and a motion to change placement and terminate temporary custody, with a request for hearing. The juvenile court adopted the case plan as an order of the court and scheduled the matter for hearing. Service issued to appellant at the Lawrence Avenue address.

{¶ 6} On May 12, 2022, the juvenile court held an adjudicatory hearing, with the hearing on disposition bifurcated at mother's request. Mother appeared at the hearing with appointed counsel and consented to a finding of neglect. The juvenile court adjudicated S.H. and her siblings neglected, continued the shelter care orders, and scheduled the matter for hearing on disposition.

{¶ 7} On August 26, 2022, the juvenile court held a dispositional hearing.

{¶ 8} Mother appeared with counsel at the hearing. Mother stipulated that the fathers of two of S.H.'s siblings were deceased and agreed to an award of temporary custody of the children to LCCS and agreed to comply with case plan services. Mother acknowledged that appellant is the father of S.H. Mother then left the hearing with the court's permission.

{¶ 9} Appellant appeared for this hearing, with appointed counsel, and for the first time was named in the LCCS case and the court's filings as a party. Testimony at the hearing demonstrated mother did not have contact information for appellant, and appellant had no contact with S.H. until recently. Additionally, during the 2019 case

3.

concerning mother and S.H., LCCS indicated that appellant may have been incarcerated. At the time of the hearing, appellant had an active warrant. Appellant did not consent to an award of temporary custody of S.H. to LCCS, and the matter proceeded to hearing as to appellant and S.H.[1]

{¶ 10} LCCS introduced testimony of an assessments caseworker, noting concerns regarding appellant. Appellant had appeared at the agency the day before hearing to take custody of S.H., and asked for the address of S.H.'s foster placement. Appellant was upset that S.H. was in foster care, and caused a disruption, resulting in security asking him to leave. Appellant provided LCCS with a phone number and address. As to temporary custody, LCCS believed temporary custody of S.H. with LCCS to be in her best interest, with a desire for appellant to complete case plan services. The juvenile court admitted LCCS exhibits that included documentation of appellant's criminal record.

{¶ 11} Appellant presented no witnesses or evidence at this hearing.

{¶ 12} Following hearing, the juvenile court found temporary custody to LCCS was in the best interest of S.H. and ordered LCCS to make reasonable efforts based on the case plan filed May 11, 2022, with a goal of reunification. The juvenile court ordered

---

[1] The father of mother's youngest child, not adjudicated within this case, also appeared at hearing and expressed his wish to obtain custody of all mother's children. As he did not file a motion in this case or seek to appeal the judgment, his appearance is not relevant to this appeal.

4.

the parties to comply with all case plan services and ordered appellant to submit a urine screen that day. The record reflected that appellant did not submit a urine screen.

{¶ 13} On September 7, 2022, LCCS filed an updated case plan, and on October 11, 2022, the juvenile court adopted the case plan as an order of the court. Subsequent case plans were filed on September 26, 2022, February 21, 2023, and March 9, 2023, with each approved as an order of the court. Consequently, appellant was ordered to comply with the following case plan services: dual diagnostic assessment, obtain appropriate housing, and complete anger management services.

{¶ 14} On December 15, 2022, LCCS filed a motion for permanent custody pursuant to R.C. sections 2151.23, 2151.413, and 2151.414.

{¶ 15} On March 9, 2023, the matter was before the juvenile court on an annual review and on the LCCS motion for an extension of temporary custody. Appellant's case plan services were outlined for the court, and included a dual diagnostic assessment, anger management, and drug screens, with LCCS requesting two screens and appellant completing no drug screens. However, appellant did provide a urine sample to Unison in December 2022, and his levels were "very high for marijuana." The juvenile court granted the motion to extend temporary custody, found that LCCS was continuing to make reasonable efforts, and ordered the parties to comply with case plan services. The court also scheduled the motion for permanent custody for trial.

5.

{¶ 16} The juvenile court held trial on the motion for permanent custody on June 15, and June 28, 2023. Mother did not appear for trial, and her counsel informed the court that mother ceased contact with counsel in January, and did not respond to attempts to reach her at her last known phone number and address since that time. The juvenile court granted mother's counsel leave to withdraw, deeming mother's lack of contact a waiver of counsel.

{¶ 17} Appellant appeared with his counsel, and at the start of the first day of trial, he made an oral motion to continue the hearing. In support, appellant argued he was "almost done completing his services" and wanted additional time to demonstrate completion of services to the court. LCCS opposed a continuance, arguing the motion for permanent custody had been pending for several months, and the matter should proceed without any delay for the "sake of permanency for these children." The CASA also opposed a continuance, noting this case was not the first for the children, who "have had dealings with Children Services" relative to the 2019 case, and deserved resolution and permanency.

{¶ 18} The juvenile court denied the request for continuance, noting the case had been pending 14 months, the motion had been pending since December, and appellant presented no reason to merit continuing the scheduled hearing.

{¶ 19} LCCS proceeded on its motion, and on the first day of trial, presented testimony of its family visits monitor, security officer, and ongoing supervisor. The

6.

family visits monitor testified regarding an incident with appellant during one of his visits with S.H., in which appellant became disruptive after being informed he was not scheduled for his visit at noon during mother's visitation time, but needed to return at 1:00 p.m., after mother's visit. The monitor testified that mother had more supervised visits, at Level 1, while appellant's visitation was Level 2, a step down from the supervision in Level 1.

{¶ 20} After the monitor and the guard told appellant he needed to come back at 1:00 p.m., according to the schedule provided by the caseworker, Appellant stood up and said, in front of S.H., that it was "bullshit" and left. He did not return for his scheduled visitation time that day, but otherwise regularly attended visitation. Appellant continued to join mother during her visitation time, in Level 1, and both mother and appellant were given visitation from 12-2:00 p.m. together with S.H. and her siblings. The monitor testified that at some point S.H. refused to go the to the Level 2 room with appellant, and "for whatever reason it didn't happen in Level 2" for the rest of the visitations. With the exception of appellant's outburst, the monitor testified that appellant was appropriate with S.H. at visitations, and was consistent in attending.

{¶ 21} The security guard also testified regarding appellant's visitation time, based on her observations in Level 1. She testified that, while appellant had Level 2 visitation, the supervisor asked the guard if appellant could come into Level 1 "because his daughter didn't want to go to the room that he was in" for Level 2 visitation, one-on-one with

7.

appellant. The guard also described an incident with appellant that resulted in appellant being asked to leave. In that instance, appellant "was interfering in a conversation that I was having with another father in the room that had nothing to do with him." After the guard told the other father that he and his child could not leave the room to visit the vending machine, appellant told the other father he could do it, and told the guard, "You don't know what you're talking about. You don't know how to do your job." The guard told appellant he needed to leave, and appellant "got up and walked out, and that was the end of it."

{¶ 22} Next, the LCCS ongoing supervisor, the supervisor for appellant's LCCS caseworker, testified regarding her direct contact with appellant. On December 19, 2022, appellant came to the agency to speak with his caseworker, but she was unavailable. The supervisor met with appellant, face-to-face, in what she believed was an unannounced visit. The two discussed his case plan, and because appellant smelled of marijuana, she asked and appellant acknowledged he currently smoked marijuana but was "trying to cut down." He admitted to using other drugs in the past, and stated his past drug use was the reason he did not want to do group sessions for substance abuse counseling, because being exposed to people who do drugs other than marijuana was triggering. Appellant told the supervisor that he did not believe he needed treatment, but would do individual counseling.

8.

{¶ 23} The supervisor testified that subsequent in-person meetings were pleasant, although his manner toward her was less friendly than his manner with others. She testified that appellant was direct on phone calls, calling for an answer to a specific question, but there were two phone calls that she witnessed that were more confrontational. The first phone call was earlier in the case, and between appellant and his case manager. Appellant could be heard screaming at his caseworker over the phone, with the volume loud enough to cause the caseworker to hold the phone away from her ear. The supervisor testified that she took the receiver from the caseworker and spoke with appellant to calm him, and he calmed down when the supervisor addressed his immediate concern regarding visitation.

{¶ 24} In the second phone call, the day before hearing, appellant was angry that the agency had filed for permanent custody. He called the supervisor names and accused the agency of trying to prevent him from reunifying with his child. The supervisor then testified regarding threats appellant directed at her, as follows:

> He said, How do you think this is going to work out for you? I had a hard time getting anything in because he kept over-talking. He said, You're going to feel my pain. And I said that sounds like a threat, [appellant]. Are you threatening me? And he went on to cuss and yell calling me the N word. He told me I was dumb as fuck, quoting him. He stated – he asked if

9.

I had children, and I said I'm not going to answer that question. And he

said that – he said I better watch over my children and then I said again

* * *

He was yelling and hung – and hung up on me.

{¶ 25} After this exchange, the supervisor alerted LCCS counsel and security, and filed an incident report. As a result of this call, appellant's visits were moved back to Level 1 and LCCS staff was directed to meet with appellant only at the agency.

{¶ 26} In addition to testimony that illustrated appellant's temper, appellant interrupted throughout the proceedings with angry outbursts, calling testimony "lies" or arguing with the witness, prompting the juvenile court to admonish appellant to not speak out and let the witness testify.

{¶ 27} After the supervisor's testimony, court recessed until the next hearing date.

{¶ 28} On June 28, 2023, trial continued on the request for permanent custody by LCCS. Mother did not appear. Appellant was present with his counsel. Prior to testimony, the parties stipulated to the admission of certified exhibits that included treatment records for appellant and the docket for an Oregon Municipal Court case in which appellant was a defendant. LCCS then called appellant's LCCS caseworker as a witness.

{¶ 29} Appellant's caseworker testified that she was assigned to the case since November 2022, after the shelter care hearing, and took over for another case worker

10.

who was no longer at LCCS. She testified regarding the case plan for the family, indicating appellant first had contact with LCCS in September 2022. Appellant's case plan services included a dual diagnostic evaluation, housing, and anger management. Appellant completed his dual diagnostic evaluation through Unison in December 2022, and Unison recommended IOP services for marijuana, but appellant did not engage in those services. Instead, appellant completed a second dual diagnostic evaluation through OhioGuidestone at the end of January 2023, and OhioGuidestone recommended weekly group, two times a month, for mental health therapy.

{¶ 30} According to his caseworker, appellant has engaged in those services, based on verbal updates from his therapist to his caseworker. Appellant's caseworker never received any records to review despite multiple requests for records from OhioGuidestone. According to the verbal reports, appellant attended his therapy sessions, and within the past month started a COG program. The caseworker was unsure what the COG program entailed, but testified "to be eligible for the COG program they would identify substance use issues and basically learn healthy coping mechanisms." The caseworker testified that this program is not the equivalent of an anger management service, and appellant was not enrolled in anger management services at any other provider, despite discussions with appellant regarding the need to engage in this service.

{¶ 31} Appellant's caseworker testified that appellant indicated openness to anger management services, and signed a release for Harbor to participate in their program, but

did not follow through after starting the COG program, which he thought was an anger management program. She admitted she had no discussion with appellant regarding the fact the COG program was not considered an anger management service. She also testified regarding the angry phone call, referenced by her supervisor in earlier testimony, but identified no other incidents with appellant aside from noting he got "angry very quickly in meetings" but would also deescalate pretty quickly, too. She identified two meetings she attended with appellant, and testified he "wasn't very open to hearing what our lawyers and what other people had to express to him."

{¶ 32} The caseworker also testified regarding visitations and her discussions with S.H. about appellant. She testified that appellant attended almost every visitation, and while he was moved to Level 2, he stayed with mother and the other children to visit with S.H., as S.H. wished. The caseworker testified that, while S.H. did not provide reasons, "she says visits are good with mom and visits are bad with dad" and indicated appellant "yells sometimes and he's loud." She acknowledged, however, that she did not observe appellant's interactions with S.H. during the visitations, and the security guard reported no incidents based on appellant's conduct with S.H.

{¶ 33} Appellant's caseworker requested his drug screens, with five screens requested and zero screens provided. She testified appellant admitted to using marijuana but claimed "he is cutting down on his marijuana usage." She also testified that appellant had recent criminal drug charges, arising from alleged possession of methamphetamine,

12.

cocaine, a pipe, and three bags of marijuana. The charges had been bound over to a grand jury, and she believed they remained pending at the time of the hearing. Because appellant did not comply with drug screening, LCCS had no way to verify whether he used the drugs allegedly found in his possession, and the criminal charges caused a concern of potential incarceration.

{¶ 34} As to housing, appellant's caseworker testified she attempted to see his prior home through unannounced home visits, but appellant moved without notice and his caseworker was not sure of the new address. Appellant provided a new address, long after he moved, but after appellant's threatening phone call with her supervisor, she was no longer permitted to do a home visit.

{¶ 35} Finally, the caseworker testified regarding S.H.'s current foster placement. She testified that S.H. is in the same placement as her brother, and she was academically behind when she first started kindergarten, but attended a summer program and is caught up "quite a bit." Although S.H. is fully potty trained, she does have accidents, often after visitations. Both S.H. and her brother expressed a desire to stay with their current foster parents. Appellant identified an aunt as a potential placement, but the aunt never followed up with LCCS to complete a home study. The caseworker testified that LCCS recommended permanent custody with the agency, in the best interests of S.H. and her siblings.

13.

**{¶ 36}** LCCS's final witness was the CASA/guardian ad litem. The CASA testified that she met with the children at least once a month for the duration of the case. She first met appellant at the court hearing in August 2022. The CASA observed the parents during visits twice, with S.H. relaxed during mother's visits and uncomfortable during appellant's visits. The CASA testified that S.H. "didn't seem relaxed. She didn't talk." The CASA also testified that both mother and appellant tried to interact with S.H. and her siblings, and she did not see anything of concern during the visits.

**{¶ 37}** As to S.H.'s foster placement, the CASA testified that S.H. and her brother are doing well in foster care, and S.H. "seems really attached to the foster parents." S.H. is affectionate towards the foster parents and "seems really happy, and she says she's happy there." While living with the foster parents, S.H.'s progress in school has improved, and the foster parents meet all S.H.'s needs and interact with her in a positive manner, with positive and supportive parenting skills. The CASA also testified that S.H. interacts with the foster parent's three biological children and one other foster child "like a sister would." S.H. has "said she would like to keep living with the foster parents." S.H. has also said "she does not want to see her father," but gave no reason in support.

**{¶ 38}** The CASA testified that the foster parents have expressed a desire to adopt S.H. and her brother. Other possible placements, provided by the parents, were not recommended. The CASA recommended permanent custody of the S.H. and her siblings with LCCS in the best interests of the children.

14.

**{¶ 39}** Appellant testified on his own behalf. He stated he first learned of the LCCS case while he was in prison, but he also testified that he was not incarcerated in March 2022. He admitted he did not see S.H. between March 2022 and shortly before the hearing in August 2022. He testified that he started inquiring to learn where S.H. was after he had not heard from mother in a while, and he had no current phone number. He created a Facebook account and messaged mother, and she responded a week later, informing him of the LCCS case. This occurred right before the hearing in August 2022, prompting his visit to LCCS to get information. Appellant acknowledged that he appeared at LCCS "demanding answers," and the situation "made my blood boil," resulting in LCCS calling police.

**{¶ 40}** Appellant testified that he had to keep pushing the prior caseworker to set up visitation with S.H., and he has attended visitation regularly since then. He believed that his visits went well. As to services, appellant testified that nobody asked him to do any services, and he did the assessments on his own. He testified he went to counseling at OhioGuidestone and participated in anger management programming there, but his caseworker did not approve the anger management. Appellant described his counseling and participation in COG, which he described as a program that addressed "behavioral steps. Like, not getting angry and not – I know if I do, though, out of frustration what is my consequences and all of that."

**{¶ 41}** Appellant acknowledged that he often got upset but testified that he got upset because of things LCCS workers did, such as canceling his visits based on mother's no-shows or because those involved in the case "try to go against me about something the truth is." When asked if the COG program helped him with anger management, appellant testified "the COG program is to get me not to get upset." Appellant testified that he was scheduled to finish the COG program July 2, 2023, but the counseling would remain ongoing.

**{¶ 42}** As to employment and housing, appellant testified he works for a company that provides a tire service for disabled semis and also for his family's construction business. At the time of hearing, he testified that he stays with a girlfriend and pays rent but is not on the lease. He described his current home as happy but not necessarily permanent, and LCCS did not attempt to visit his home.

**{¶ 43}** At several points in his testimony, both on direct and cross examination, appellant exhibited frustration and anger, lashing out at the attorney questioning him, prompting the juvenile court to stop and address appellant as follows:

> Sir, I need to hear the information. She's trying to give information to me, the judge, that is going to make the decision. So maybe you think some of these questions aren't very important, but they are important to her and then every other lawyer who is asking questions. So – no, no. So what I'm trying to do is help you not lose your temper.

16.

{¶ 44} Appellant testified about his temper, acknowledging the recent phone call with the LCCS supervisor, and when asked whether he was aware the supervisor considered the phone call a threat, stated, "No, I am not considering that. But I know what a threat is." He admitted the phone call occurred after he had been participating in the COG program for some time, but maintained the call was not a threat, because he knew "how to talk" and "how to word what I say."

{¶ 45} Finally, the juvenile court inquired regarding appellant's relationship with S.H. Appellant testified that he was incarcerated when S.H. was born in 2016, and he first saw her when he was released from prison in April 2021. Appellant testified he had "more conversations than [in-person] visits" with S.H. prior to the LCCS case, and probably saw her in person four or five times before the Agency was involved. He testified that he has four other children, ranging in age from eight to 18. None of his other children live with him, but he testified he sees each child every day and pays child support.

{¶ 46} At the close of hearing, the juvenile court heard argument from the parties regarding the motion for permanent custody. LCCS argued that permanent custody with LCCS was in the best interest of S.H and her siblings. As to appellant, LCCS noted he participated in some case services but continues to exhibit problems controlling his anger, the threatening phone call an example of appellant's lack of control. Additionally, LCCS noted that appellant did not complete his substance abuse treatment, submitted no drug

17.

screens requested by the Agency, and admits to using marijuana. At the time of hearing, appellant also had four, pending drug-related charges for drugs other than marijuana. S.H. is bonded with her foster parents and doing well and expressed a wish to remain in that placement.

{¶ 47} Appellant's trial counsel argued against permanent custody, and for denial of the LCCS motion. Counsel pointed to the case plan services appellant did complete, and his consistent attendance at visitations. While not excusing appellant's outbursts, Counsel argued that much of it stemmed from frustration with the Agency, and was not directed at S.H. Appellant's counsel requested the court deny the motion and extend temporary custody so that appellant could complete his case plan services within a six-month period and continue visitations with S.H.

{¶ 48} At the close of the hearing, the parties agreed to an in-camera hearing with an older sibling of S.H., at which time the case would be submitted for decision.

{¶ 49} On July 11, 2023, the juvenile court called the matter for hearing to place its decision on the record. Neither mother nor appellant appeared. Appellant's trial counsel appeared on his behalf.

{¶ 50} The juvenile court, having reviewed all admissible evidence and the testimony from the in-camera interview, found by clear and convincing evidence that, despite reasonable efforts to prevent the continued removal of the children from their

18.

parents, that the children should not and could not be returned to the parents, and found permanent custody of the children to LCCS was in the best interests of each child.

{¶ 51} The juvenile court's findings with respect to S.H. were that reasonable efforts to reunify had been made, but it was in S.H.'s best interest for permanent placement with LCCS pursuant to R.C. 2151.414(E)(1) and (4).

{¶ 52} On July 26, 2023, the juvenile court filed its judgment entry, denying appellant's motion to continue the permanent custody trial, construing appellant's request for additional time as a motion to extend temporary custody and denying that motion, and awarding permanent custody to LCCS. The juvenile court found by clear and convincing evidence that S.H. cannot be placed with the parents within a reasonable time or should not be placed with the parents, in accordance to R.C. 2151.414(B)(1)(a). The court further found, by clear and convincing evidence, that a grant of permanent custody to LCCS was in S.H.'s best interest under R.C. 2151.414(D).

{¶ 53} As part of its factual findings, the juvenile court determined that appellant completed a dual diagnostic assessment with two different mental health providers, participated in individual substance use treatment, a weekly group, and mental health therapy twice a month, but did not participate in an anger management program and has not completed drug screens requested by LCCS. Appellant admitted to using marijuana, but claimed he is cutting down on use, and has four pending drug charges that have been bound over to the Lucas County grand jury, with the allegations involving offenses with

19.

drugs other than marijuana, and potential incarceration is a concern for LCCS. Finally, appellant has not demonstrated verifiable stable, appropriate housing, and LCCS has continuing concern for appellant's anger issues, with the most recent incident a threatening phone call to the LCCS supervisor on the day prior to the beginning of trial.

{¶ 54} The juvenile court found that under R.C. 2151.414(E)(1), following placement of S.H. outside the home and notwithstanding reasonable case planning and diligent efforts by LCCS to assist to remedy the problems that initially caused that placement, appellant failed to continuously and repeatedly, substantially remedy the conditions. While appellant did engage in services, he still exhibits concerning behavior including the inability to control his anger, evidenced by the threats to the LCCS supervisor and his behavior at trial. Appellant also did not complete drug screens requested by LCCS or a drug screen ordered by the court. Finally, appellant failed to obtain appropriate housing.

{¶ 55} The juvenile court further found that under R.C. 2151.414(E)(4), appellant demonstrated a lack of commitment to S.H. by failing to regularly support, visit, or communicate with S.H., or by other actions showing an unwillingness to provide an adequate permanent home for the child. Specifically, the juvenile court found appellant failed to show a lack of substantial compliance with his case plan, including failing to demonstrate an ability to control his anger, failing to establish stable housing, failing to submit to drug screens, and obtaining another drug charge while the case was pending.

20.

{¶ 56} In weighing the best interests of the child, the juvenile court noted S.H. is bonded to her foster parents and doing well in placement, along with her brother. S.H., also, has been in the custody of LCCS since March 11, 2022. Finding S.H. needs a legally secure placement, and with no family identified to provide a permanent home that meets her needs, the juvenile court determined a legally secure, permanent placement can not be achieved without a grant of permanent custody to LCCS.

{¶ 57} This appeal followed.

### III. Assignment of Error

{¶ 58} Appellant asserts a single assignment of error on appeal, as follows:

> 1. The finding of permanent custody being in [S.H.'s] best interest was against the manifest weight of the evidence as Father had completed case plan services.

### IV. Analysis

{¶ 59} In reviewing the juvenile court's decision to terminate parental rights and award permanent custody to LCCS, we must determine whether the juvenile court's findings are supported by the manifest weight of the evidence. *In re Z.C.,* Slip Opinion 2023-Ohio-4703, ¶ 1; *In re A.H.,* 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11. "Reversal is proper only where [it is] determined, after weighing the evidence and all reasonable inferences including the credibility of the witnesses, that the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the judgment

21.

must be reversed." *In re N.J.,* 6th Dist. Lucas No. L-23-1114, 2023-Ohio-3190, ¶ 38, citing *In re T.J.*, 2021-Ohio-4085, 180 N.E.3d 706, ¶ 40 (6th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 60} In a review based on manifest weight, we recognize that the juvenile court is in the best position to weigh evidence and evaluate testimony, so "every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *In re A.E.,* 6th Dist. Lucas No. L-23-1043, 2023-Ohio-2310, ¶ 58, quoting *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, fn. 3, 461 N.E.2d 1273 (1984).

{¶ 61} Before terminating parental rights and granting permanent custody to LCCS under R.C. 2151.414, the juvenile court must first find, by clear and convincing evidence, that (1) one of the enumerated factors under R.C. 2151.414(B)(1)(a)-(e) apply and (2) that permanent custody is in the best interest of the child. R.C. 2151.414(B)(1). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

22.

{¶ 62} In this case, appellant only disputes the juvenile court's award of permanent custody, with no challenge to the finding regarding neglect.

{¶ 63} Under R.C. 2151.414(B)(1)(a), a court may grant permanent custody of a child when it is in the best interests of the child, by clear and convincing evidence, and the child has not been in the temporary custody of the agency for twelve or more months within a consecutive twenty-four-month period and the evidence demonstrates "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents. Because the juvenile court determined R.C. 2151.414(B)(1)(a) applied, it examined the factors under R.C. 2151.414(E), with only one factor required to support a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re T.G.,* 6th Dist. Lucas No. L-23-1073, 2023-Ohio-2576, ¶ 38.

{¶ 64} Here, the juvenile court determined that the factors under (E)(1) and (4) applied. As stated in R.C. 2151.414(E):

> * * * If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

23.

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

\* \* \*

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

{¶ 65} If the juvenile court determines any of the factors in R.C. 2151.414(E) applies, it must next determine whether an award of permanent custody to LCCS is in the best interest of the child, based on the factors in R.C. 2151.414(D)(1).

24.

{¶ 66} Appellant's assignment of error raises two arguments, addressing the findings under R.C. 2151.414(B), as well as the best interest of the child determination in R.C. 2151.414(D)(1). We address each argument in turn.

### A. The manifest weight of the evidence supported the juvenile court's finding that S.H. could not be placed with either parent within a reasonable time or should not be placed with either parent.

{¶ 67} In his first argument, appellant contends the juvenile court erred in determining S.H. could not be placed with either parent within a reasonable time or should not be placed with either parent, based on R.C. 2151.414(B)(1)(a) and the factors under R.C. 2151.414(E). Appellant acknowledges that the juvenile court found "he failed to control his anger, he failed to complete drug screens, failed to obtain appropriate housing, [and] was charged with another drug charge while the dependency case was open."

{¶ 68} Appellant does not dispute the facts demonstrated by the evidence at trial, that he had anger issues, completed no drug screens, never had his housing approved, or was charged with new criminal offenses. Instead, appellant ignores his lack of compliance with drug screens and argues that the findings of the juvenile court should have included consideration of other factors, as presented through his own testimony.

{¶ 69} Appellant argues that his new drug charges were dismissed by the grand jury, after the close of testimony, a matter not placed in the record of this case. Next, appellant argues his anger was never directed toward S.H., leading to the conclusion he

25.

was not a danger to S.H. Appellant acknowledges his anger, but argues "a hard-headed personality is not a bar to being a parent," and without LCCS demonstrating a link between appellant's personality and negative effects on S.H.'s health, safety, or welfare, the finding of the court lacked evidentiary support. Finally, appellant argues that LCCS made little to no attempt to see his housing, based solely on his own testimony and without any attempt to address evidence that he moved without notifying LCCS for months and threatened an LCCS supervisor, precluding a site visit by LCCS personnel.

{¶ 70} Appellant accepts the juvenile court's finding that he refused to submit to drug screens, a part of his case plan services, and otherwise argues that the juvenile court should have weighed his testimony more favorably as to other factors concerning his anger issues or housing. In a review under the manifest weight of the evidence standard, however, the juvenile court's "determination of credibility of testimony and evidence must not be encroached upon[.]" *Seasons Coal Co., Inc. v. City of Cleveland,* 10 Ohio St.3d 77, 81, 461 N.E.2d 1273 (1984).

{¶ 71} The juvenile court determined the factors under R.C. 2151.414(E)(1) and (4) applied to appellant. Upon review of the record, we conclude that competent credible evidence in the record supports the juvenile court's findings by clear and convincing evidence that appellant failed to remedy the problems that caused S.H. to be placed outside the home and failed to demonstrate a commitment toward S.H. based on his unwillingness to show substantial compliance with his case plan, including demonstrating

26.

the ability to control his anger, demonstrating stable housing, and submitting to drug screens.

{¶ 72} Appellant's first argument, therefore, lacks merit.

**B. Permanent custody award to LCCS is in S.H.'s best interest.**

{¶ 73} In his second argument, appellant contends it was not in S.H.'s best interest to lose her relationship with appellant, her father. In support, appellant acknowledges the juvenile court's findings that S.H. was bonded with her foster parents and doing well in her placement, and no other family was identified, appropriate to take legal custody of S.H. Rather than dispute these findings, appellant argues that the juvenile court failed to credit his involvement with S.H., and his lack of past involvement with LCCS regarding his other children. Appellant also characterizes his angry posture with LCCS staff as strong devotion to S.H. that should weigh in his favor in determining the best interests of S.H.

{¶ 74} In reviewing the record, we find clear and convincing evidence to support the juvenile court's finding. Appellant's argument, moreover, does not challenge the evidence but, instead, attacks the credibility determination and seeks an interpretation of the evidence that favors him. For example, he argues that he never had involvement with LCCS regarding his other children, but he also never had custody of any of his other children, with his testimony describing the relationship as seeing them every day and paying child support. The juvenile court, moreover, found his anger issues to be a

27.

negative, and not a positive sign of his desire to be in S.H.'s life. As addressed relative to appellant's first argument, we do not encroach on the juvenile court's credibility determination in a manifest weight of the evidence review. Accordingly, we find appellant's second argument lacks merit.

{¶ 75} Based on the foregoing, appellant's assignment of error is not well-taken.

**V.     Conclusion**

{¶ 76} Finding substantial justice has been done, we affirm the judgment of the Lucas County Court of Common Pleas, Juvenile Division, awarding permanent custody of S.H. to LCCS. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                    _____
                                                         JUDGE
Gene A. Zmuda, J.

Myron C. Duhart, J.                                   JUDGE
CONCUR.

                                                    _____
                                                         JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.